UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEMTRON CORPORATION,

     Plaintiff,

                                     Case No. 1:04-0387

-vs-                                  Hon:  AVERN COHN

SAINT-GOBAIN CORPORATION,

     Defendant.

_____/

**MEMORANDUM AND ORDER
DENYING SAINT-GOBAIN'S RULE 50 MOTION
FOR JUDGMENT AS A MATTER OF LAW**

I.  INTRODUCTION

This is a patent case.  The patent-in suit, owned by plaintiff Gemtron Corporation (Gemtron), is U.S. Patent No. 6,679,573 B2 (the '573 Patent), which covers a Refrigerator Shelf.  On January 28, 2008, a jury, following a four (4) day trial, found the '573 Patent valid.  It also found that defendant Saint-Gobain Corporation (Saint-Gobain) infringed Claim 23 of the '573 Patent in the sale in the United States of its model SG16 refrigerator shelf (the SG16).  A copy of the Partial Judgment In A Civil Case entered pursuant to the jury verdict is attached as Exhibit A.

Under the Amended Scheduling Order entered January 26, 2007:

- The parties were realigned.  The case began with a declaratory judgment complaint filed by Saint-Gobain.

1

- The '573 Patent was designated the paradigm patent.  (U.S. Patent No. 6,422,673-1, covering a Refrigerator Compartment Housing Vertically Adjusting Shelves, was also alleged to infringe.)

- Claim 23 of the '573 Patent was designated the representative claim.

- The SG16 was designated the paradigm product.  (Previously models SG1, SG2 and SG3 sold by Saint-Gobain in the United States were found to infringe.  See Opinion And Order On Parties' Renewed Motions For Partial Summary Judgment entered April 17, 2006.  Also, the Partial Judgment, Exhibit A, describes all of the refrigerator shelves sold by Saint-Gobain in the United States which, according to the jury verdict, infringe Claim 23 of the '573 Patent.)

Under the Pretrial And Scheduling Order entered August 16, 2007, the issues of validity and infringement were bifurcated from the issue of damages.  Also, though not recited in any order, the issue of wilfulness was to be tried with the issue of damages.[1]

Lastly, the defense of enabling disclosure and of written description initially in the case were withdrawn by Saint-Gobain during the instruction conference following the conclusion of the proofs.  (See Tr. 01/28/08, p.4).

## II.  THE PENDING MOTION

### A.  The Motion

Now before the Court is Saint-Gobain's Rule 50 Motion For Judgment As A Matter Of Law.  The text of the motion is highly argumentative.  For example, the supplement to Saint-Gobain's brief in support of the motion is styled:

---

[1] Saint-Gobain was granted summary judgment on the issue of wilfulness.  See Memoranda and Order of March 24, 2008 and Order Denying Motion For Reconsideration of April 3, 2008.  The parties eventually agreed on a reasonable royalty rate.  The number of infringing shelves and the prices at which they were sold is still to be decided by the Court.

Saint-Gobain's Supplement To Its Rule 50 Motions Concerning Gemtron's Infringement Theory That There Is No Temperature Limitation In Claim 23 And, Therefore, It Can Cook SG16 In An Oven to Prove Infringement

It is difficult to state the grounds of the motion in a concise fashion.  They can be best described by quoting from Saint-Gobain's Reply To Gemtron's Opposition To Saint-Gobain's Rule 50 Motions For Judgment As A Matter of Law (p. 1) as follows:

> In requesting judgment as a matter of law, plaintiff Saint-Gobain Corporation ("Saint-Gobain") has made four principal arguments: (1) Gemtron's infringement theory fails, because it is based on evidence that relates to the characteristics of the SG16 shelf when altered after being heated to more than double its normal temperature; (2) Gemtron's infringement theory fails, because it is based on evidence that relates to the characteristics of the SG16 shelf when it is in Mexico, as opposed to in the United States; (3) irrespective of the "heating" and "Mexico" issues, there was no substantial evidence to support the jury's finding of infringement; and (4) at trial, Saint-Gobain proved that claim 23 is obvious and, therefore, invalid, and there was no substantial evidence to support the jury's finding that the '573 Patent is not obvious.

## B.  The Ruling

As will be discussed, the motion lacks merit.  Based on the interpretation of Claim 23 as described in the Order on Claim Construction, as supplemented by the Opinion And Order On Parties' Renewed Motion For Partial Summary Judgment, the proofs at trial were such that the jury could reasonably have found by a preponderance of the evidence that the SG16 infringed Claim 23 of the '573 Patent.  Also, the proofs at trial were such that the jury could reasonably have found that they were not clear and convincing regarding the invalidity of Claim 23 of the '573 Patent.  Accordingly, there is no good reason to set aside the jury's verdict and therefore the motion is DENIED.

### III.  BACKGROUND OF THE CASE BEFORE THE JURY

#### A.  Prior Orders And Decisions

The prior orders and decisions as well as the number of docket entries (over 600) reflect a protracted and contentious case.  The significant orders and decisions are as follows:

- Order On Claim Construction - October 3, 2005

- Opinion And Order On Parties' Renewed Motions For Partial Summary Judgment - April 12, 2006 (denying Saint-Gobain's motion and granting Gemtron's motion that the SG1, SG2 and SG3 refrigerator shelves infringe claims 23 to 30 or the '573 patent

- Order On [defendant's] Motion For Reconsideration - April 25, 2006

- Memorandum And Order Denying Motion For Summary Judgment On Issue Of Validity (Obviousness) - December 6, 2007

#### B.  Claim 23

##### 1.  The Claim

Claim 23 describes a refrigerator shelf that is constructed from a frame made of synthetic material and a panel of glass.  The claim reads:

A refrigerator shelf comprising:

- A. a one-piece open frame made of substantially homogeneous polymeric/copolymeric molded synthetic material and a piece of glass closing an opening defined by said frame;

- B. said open frame having opposite substantially parallel side frame portions and opposite substantially parallel front and rear frame portions; said glass piece having opposite substantially parallel side edges and opposite substantially parallel front and rear edges;

4

C.    said side, front and rear frame portions being substantially contiguous to said respective side, front and rear edges;

D.    each of said side frame portions being defined by

        I.    an upper wall,

        ii.    a side wall depending from each upper wall and

        iii.    a lower wall projecting from its side wall toward an opposite side wall

        iv.    with the opposing lower walls being spaced from each other and each defining with an associated upper wall a glass piece side edge-receiving channel, each upper wall and lower wall having a terminal free edge,

        v.    said glass piece side edges being spaced a predetermined distance from each other,

        vi.    said upper wall terminal free edges being spaced a predetermined distance from each other,

        vii.    said lower wall terminal free edges being spaced a predetermined distance from each other,

        viii.    the predetermined distance of the glass piece side edges being appreciably greater than the predetermined distance of said upper wall edges and only slightly greater than the predetermined distance between said lower wall terminal free edges whereby said glass piece side edges are captively retained in said glass piece side edge-receiving channels, and

E.    at least one lower wall of at least one of said front and rear frame portions including a relatively resilient end edge portion which temporarily deflects and subsequently rebounds to snap-secure one of said glass piece front and rear edges in the glass piece edge-receiving channel of said at least one front and rear frame portion.

2.  Interpretation

The parties agree that the only element of Claim 23 on which they disagree is the

phrase:

> relatively resilient end edge portion which temporarily deflects
> and subsequently rebounds to snap-secure.

Gemtron contends that the phrase should be interpreted as follows:

> The end edge portion is physically characterized by being
> relatively resilient such that it can temporarily deflect and
> subsequently rebound, when glass is being inserted into the
> frame, to snap-secure the glass into the frame.

Saint-Gobain contends that the phrase should be interpreted as follows:

> The end edge portion is sufficiently flexible to permit the glass
> in the finished product to be pushed out of the frame and
> pushed back into the frame.

The Court, after a reasoned discussion of the contending positions, interpreted the

phrase as follows:

> Based upon the foregoing, the Court interprets the relevant
> claim language – "*relatively resilient end edge portion which
> temporarily deflects and subsequently rebounds to snap-
> secure*" – as follows: the end edge portion is sufficiently
> resilient that it can temporarily deflect and subsequently
> rebound when glass is being inserted into the frame.

This interpretation was supplemented in the Opinion and Order on Parties' Renewed

Motion for Partial Summary Judgment as reflected in the following excerpt from the

Opinion:

Saint-Gobain argues that the Miedema[2] test is "bogus" because it involved the application of heat to the plastic frames of the Saint-Gobain shelves.  According to Saint-Gobain, the testing previously suggested by the court did not contemplate heating the frame.  Moreover, according to Saint-Gobain, a test in which the shelf is heated is not a proper test of the product as it is sold and used.

* * *

. . .the question is solely whether the accused frames are able to temporarily deflect and subsequently rebound when glass is being inserted at *any* temperature.  Even though the patent for Gemtron's shelf contemplates an ultimate use within the fresh food or freezer compartment of a refrigerator, the asserted claims themselves contain no temperature limitation and the characteristic of relatively resiliency is defined solely with respect to the ability to insert glass into the frame, which could only occur while the shelf is not in use.  The court cannot read a temperature limitation into the claim which is not contained in the claim language.

* * *

Saint-Gobain has, in its motion, demonstrated non-infringement only at a single temperature.  However, the asserted claims do not limit the temperature at which relative resiliency – as construed by the court – is present.  Gemtron has demonstrated that conditions exist under which Saint-Gobain's shelves have the relatively resilient characteristic contained.

The absence of a temperature limitation in Claim 23 was emphasized in the Court's

Order on Plaintiff's Motion For Reconsideration as follows:

As this Court noted in its April 17, 2006 decision, the relevant characteristic of Gemtron's patent is defined in terms of the time the glass is inserted into the frame but not with reference

---

[2]  Miedema was Gemtron's expert.  As the predicate for his opinion, he heated a SG16.  While the shelf was in its heated state, he removed the glass panel and then reinserted and secured it in a manner which he described as snap-securing the glass in the frame.

to any particular temperature.  The function of the shelf is not at issue, but rather the resilience of the frame at the time the glass is inserted.  The relevant claim language, properly construed, contains no temperature limitation.  Moreover, Saint-Gobain has not disputed that its shelves are made from a thermoplastic material, which is by definition capable of being repeatedly reheated and reshaped without losing its characteristics.  See Oxford English Dictionary Online (2d ed. 1989), http://dictionary.oed.com (Defining "thermoplastic" as "becoming soft when heated and rigid when allowed to cool, and capable of being repeatedly reheated and reshaped without loss of properties; made of such a substance").  In summary, nothing in the High Tech case compels a different result in this case.

## IV.  THE TRIAL

The trial extended over four (4) days, two (2) days of which were directed to the evidentiary proofs.

### A.  Witnesses

#### 1.  Gemtron

- Mark Delp – Executive Vice President of Gemtron.  He described Gemtron and its ownership of the '573 Patent.

- Jorge Merino (deposition) – an industrial engineer employed by Saint-Gobain in Mexico.  He described the manufacturing of the SG16.

- Greg Miedema – an expert.  He expressed the opinion that the SG16 infringed Claim 23 of the '573 Patent.  He took an SG16, heated it, removed the glass panel, reinserted it in the frame, and then secured it.  He displayed a video of his actions as well as photographs.  He analogized what he did to come to the conclusion the glass panel was snap-secured to what was displayed in the video of the manufacture of the SG16 in Mexico described below.

- Francois Vardon (deposition) – general director of Saint-Gobain's Mexican facility and designer of the SG16.  He described his familiarity with the '573 Patent and the manufacture of the SG16.  He was the author of Plaintiff's

Exhibit 38, a presentation concerning the operations at Saint-Gobain's Mexican facility.

- Steven Gendell - a French language translator.

- Roger Hamilton (in rebuttal) – an expert with familiarity in the design of refrigerator shelves.  He expressed the opinion that the '573 Patent was non-obvious in light of prior art.

### 2. Saint-Gobain

- Jorge Merino (live) – he described the manufacture of the SG16 and the manner in which the glass was inserted in the frame and the manner in which it was secured.

- Dr. Henry W. Stall – an expert.  He expressed the opinion that the SG16 did not infringe Claim 23 of the '573 Patent and that the '573 Patent was obvious in light of the prior art.

### B.  Exhibits

Many exhibits were introduced in evidence.  The exhibits included patents, shelves, frames, brochures, manufacturing specifications, drawings, videos of simulations, and a video displaying the manufacture of the SG16 and photographs.  Of particular significance were Exhibit 124, a video of the manufacture of the SG16 in Saint-Gobain's Mexico plant; Exhibit 38, a commentary on a new Saint-Gobain shelf; and Exhibit 549, illustrated instructions for assembling the SG16.  A copy of Exhibit 549 is attached as Exhibit B.

Exhibit 124 displays an operator taking a frame off of an injection molding machine at an elevated temperature, inserting a glass panel into the frame, deflecting fingers along the edge of the frame as the glass panel was being inserted, and the fingers rebounding to snap the glass in the frame.

Exhibit 38, a Saint-Gobain document describing a new shelf, is in French.  Gendell translated the French word "dipsage" to mean "snap-on."  The phrase in which it was used was translated by Gendell (Tr. 01/23/08, p. 170) as follows:

> for the development of a bold and original joining process enabling the assembly of glass and plastic through snap-on installation, which possesses several industrial advantages.

Gendell was vigorously cross-examined.  The credibility of his translation was for the jury to decide.

## V.  THE LAW

### A.  Judgment As A Matter Of Law

The law on a motion for judgment as a matter of law is well known.  The Court recently stated the law as follows:

> Fed.R.Civ.P. 50 provides the following standard for granting judgment as a matter of law:
>
>> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
>
> Fed.R.Civ.P. 50(a)(1).  In addition, when a party makes a renewed motion after a verdict has been returned, the court may: "(A) allow the judgment to stand, (B) order a new trial, or (C) direct entry of judgment as a matter of law[.]" Fed.R.Civ.P. 50(b)(1).  The inquiry for resolving a Rule 50 motion for judgment as a matter of law is the same as the inquiry for resolving a motion for summary judgment under Fed.R.Civ.P. 56.  White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789,

794 (5th Cir. 2004) (en banc) (citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000). That is, "[j]udgment as a matter of law is appropriate when 'viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party.'" <u>Tisdale v. Fed. Express Corp.</u>, 415 F.3d 516, 527 (6th Cir. 2005) (internal quotation marks omitted). <u>See also Johnson Controls v. Jay Ind.</u>, ___ F.3d ___, 2006 WL 2380827 (6th Cir. Aug. 18, 2006).

<u>Sundance, Inc. v. DeMonte Fabricating, Ltd.</u>, 2006 WL 2708541, at *2 (E.D. Mich. Sept. 20, 2006); <u>see also Sundance, Inc. v. DeMonte Fabricating, Ltd.</u>, 485 F. Supp. 2d 805, 809-10 (E.D. Mich.).

### B. Instructions

The instructions stated the law applicable to the issues to be decided by the jury.

### 1. Interpretation of Claim 23

The jury was instructed as to the meaning of Claim 23 as follows:

> Near the end of claim 23 is an element that was mentioned often in the trial: a relatively resilient end edge portion which temporarily deflects and subsequently rebounds to snap-secure. The claim language "a relatively resilient end edge portion which temporarily deflects and subsequently rebounds to snap-secure" means that "the end portion is sufficiently resilient that it can temporarily deflect and subsequently rebound when glass is being inserted into the frame."

> Claim 23 does not place any limitation on what the temperature of the frame has to be when the glass is inserted.

### 2. Infringement

As to infringement the jury was instructed:[3]

_____

[3] Saint-Gobain's challenge to the instructions which were rejected by the Court are the subject of Saint-Gobain's motion for a new trial. This motion was denied by the

11

In this case, Gemtron has alleged that Saint-Gobain directly infringes claim 23 of the '573 patent.

In order to prove infringement, Gemtron must prove the requirements for this type of infringement are met by a preponderance of the evidence, *i.e.*, that it is more likely than not that all of the requirements of direct infringement have been proved.

A company directly infringes a claim if, during the time the patent is in force, the company makes, uses, sells, or offers to sell within, or imports into, the United States a product that meets all of the requirements of the claim and does so without the permission of the patent holder. There is no dispute over the fact that the SG16 shelf was sold or used in the United States. To determine whether a particular product meets all of the requirements of a claim, you must understand the meaning of the words in the claim and the requirements that these words impose. I have already explained to you the meaning of some of the words of the claims in this case. I have also explained to you that other words in the claims should be given their plain English meaning. You must compare the product with each and every one of the requirements of claim 23 of the '573 patent to determine whether all of the requirements of that claim are met. When the product meets all of the requirements of a claim, the product is said to "literally infringe" that claim. If a product that literally infringes a claim is made, used, sold, offered for sale within, or imported into, the United States during the time the patent is in force, without Gemtron's authorization, it directly infringes the claim.

In order to prove direct infringement by literal infringement, Gemtron must prove that the above requirements are met by a preponderance of the evidence, *i.e.*, that it is more likely than not that the SG16 shelf meets all of the requirements of claim 23 of the '573 patent.

### 3. Invalidity

As to invalidity the jury was told:

---

Court in a Memorandum and Order of even date.

12

To prove that claim 23 is invalid, Saint-Gobain must persuade you by clear and convincing evidence. That is, in order to find claim 23 invalid you must be left with a clear conviction that the claim is invalid.

### 4.  Obviousness

As to obviousness the jury was told:

Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable the invention must also not have been obvious to a person of ordinary skill in the field of technology of the patent at the time the invention was made.

Saint-Gobain may establish that claim 23 is invalid by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons of ordinary skill in the art at the time the invention was made. For claim 23 to be invalid because it would have been obvious you must first evaluate the following factors:

(1)  What is the scope and content of the prior art;

(2)  What are the differences, if any, between the invention and the prior art;

(3)  What was the level of ordinary skill in the art at the time the invention was made; and

(4)  What evidence is there, if any, of certain additional considerations relating to the obviousness or non-obviousness of the invention?

You must decide, in view of the evidence presented to you on these factors, whether or not the invention, considered as a whole, would have been obvious to one having ordinary skill in the art at the time the invention was made.

Before doing so, however, you must keep in mind that it is not permissible to use hindsight in assessing whether the invention is invalid for obviousness. You cannot look at the invention knowing what persons of ordinary skill in the art know today. Rather, you must place yourself in the shoes of a person

having ordinary skill in the field of technology of the patent at the time the invention was made.

In this case, Saint-Gobain contends that the inventions are obvious in view of a combination of more than one "prior art" reference.  In placing yourself in the shoes of a person having ordinary skill in the field of technology relevant to this case at the time the invention was made, you may also consider whether such a person would have been motivated to combine these prior art references in order to arrive at the claimed invention.

The first question you must answer in determining whether or not the invention was obvious is the scope and content of the prior art at the time the invention was made.  You must decide whether specific references relied upon in this case are "prior art" to the invention described in claim 23 of the '573 patent.

"Prior art" includes previous devices, articles and methods that were offered for sale, printed publications or patents that disclose the invention or elements of the invention.  Once you decide whether or not specific references are prior art, you must also decide what those references would have disclosed or taught to one having ordinary skill in the field of technology of the patent at the time the invention was made.

In order for a reference to be relevant for you to consider in deciding whether or not the claimed invention would have been obvious, the reference must be within the field of the inventor's endeavor, or if it is from another field of endeavor, the reference must be reasonably related to the particular problem or issue the inventor faced or addressed when making the invention described in claim 23 of the '573 patent.  A reference from a field of endeavor other than the inventor's is reasonably related to the problems or issues the inventor faced if the reference is one which, because of the matter with which the reference deals, logically would have commended itself to the attention of the inventor when considering the problems or issues he faced in this case.  It is for you to decide what the problems or issues were that the inventor faced at the time the invention in claim 23 was made.

The second question you must answer in determining whether or not the invention was obvious at the time it was made is what differences there are, if any, between the prior art and the

patented invention.  In analyzing this issue, do not focus solely on the differences between the prior art and the invention because the test is not whether there are differences.  Rather, the test is whether or not the invention, as a whole, would have been obvious to one having ordinary skill in view of all the prior art at the time the invention was made.

In this case, Saint-Gobain contends that the invention would have been obvious over a combination of known prior art.

In determining whether or not the invention would have been obvious to one of ordinary skill in the art at the time the invention was made, you must consider whether or not the combination is more than the predictable use of prior art elements according to their established functions.   In answering this question, it will often be necessary to consider: any apparent reason to combine the known elements in the manner of the patent claim; teachings of multiple references; the effects of demands that were known to the community or that were present in the marketplace; and the background knowledge possessed by persons of ordinary skill in the art.

To find by clear and convincing evidence that the invention would have been obvious, it is important for you to identify a reason that would have prompted a person of ordinary skill in the art to combine the elements as the invention does.  Advances that would have occurred anyway in the ordinary course of development of the art may have been obvious but you need not limit your consideration to the same problem or same prior art elements, or same solution adopted by the inventor.  You should consider the level of common sense and creativity of persons of ordinary skill in the art, that familiar items may have obvious uses beyond their primary purposes, and that a person of ordinary skill in the art may be able to fit the teachings of multiple patents and/or references together like the pieces of a puzzle.

The reason to select and combine features, the predictability of the results of doing so, and a reasonable expectation of success may be found in the teachings of the prior art references themselves, in the nature of any need or problem in the field that was addressed by the patent, in the knowledge of persons having ordinary skill in the field at the time, as well as in common sense or the level of creativity exhibited by

persons of ordinary skill in the art.  There need not be an express or explicit suggestion to combine references.

### C.  Source of the Instructions

The instructions were drawn from the Court's decision in <u>Sundance</u>, <u>supra</u>, and the Federal Circuit Bar Association Model Patent Jury Instructions (last edited January 12, 2008).

### VI.  INFRINGEMENT

### A.  Alteration of the SG16 By Heating

Saint-Gobain first argues that the characteristics of the SG16 were altered by heating an exemplar to twice its normal temperature to establish infringement.  This has reference to the manner in which Miedema came to the conclusion in support of Gemtron's motion for summary judgment that the SG1, SG2, and SG3 infringed Claim 23.  Miedema also testified to this effort at trial (see p. 8, <u>supra</u>).

Miedema did not alter the SG16 when, in Saint-Gobain's words, he "cooked" it in an oven.  What Miedema did was attempt to replicate the manufacture of the SG16 as he understood it: the glass being inserted and secured in the frame at an elevated temperature.  The heated environment was intended to illustrate the condition which exists when the shelf is assembled.  Had the video of the manufacturing process in Mexico, Plaintiff's Exhibit 124, been available to Miedema initially, there would have been no need for his experimentation.

The persistent effort of Saint-Gobain to ridicule what Miedema did was at best an effort to confuse.

16

B.  Characteristics In Mexico Not Reflected In The United States

Saint-Gobain also argued that the conditions under which the SG16 is manufactured in Mexico do not obtain in the United States because in the United States the SG16 is rigid and inflexible.  This argument was previously dealt with in the claim construction phase of the case.  Again, this repeats Saint-Gobain's effort to insert a temperature limitation into Claim 23.

As manufactured, the SG16 has a relatively resilient end edge portion which temporarily deflects and subsequently rebounds to snap-secure the front rear edges of the glass panel.  This characteristic still obtains when the SG16 is sold in the United States.

Saint-Gobain essentially argues that when the SG16 is imported into the United States from Mexico, the frame is rigid and therefore must be heated to prove infringement.  This argument was rejected in the claim interpretation phase of this case.  As to the fact that the SG16 is manufactured in Mexico and sold in the United States some additional comment is in order.

In Biotec Biologische Naturverurpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1350 (Fed. Cir. 2001), the court held:

> Infringement of product claims by an imported product requires that the product be viewed in the form in which it is present within the United States.  See 35 U.S.C. §271(a) ("whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States" infringes the patent).  However, evidence of foreign activities may be relevant to determination of infringement upon importation.

Here the snap-secure element as interpreted by the Court requires that this characteristic be present in the SG16 in the form in which it is used.  The proofs established that as manufactured it retained this characteristic in the form in which it was

17

present in the United States, since its temperature while in the United States is not restricted by the claim language.

Saint-Gobain argues that the snap-secure element does not exist in the SG16 as it is present in the United States because applying heat to the frame to prove infringement is a modification or change which takes the SG16 outside the limitations of the claim. This argument focuses solely on Miedema's opinion in the summary judgment phase, before he observed the video of the manufacture of the SG16 in Mexico.

Saint-Gobain repeatedly cites three (3) cases which it says display fact analogies to what Miedema did: Orinco Corp. v. Align Technology, Inc., 463 F3d 1299 (Fed Cir 2006); In re Buszard, 504 F3d 1364 (Fed Cir 2007) and High Tech Medical Instrumentation v. New Image Industries, 49 F3d 1551 (Fed Cir 1995). They do not support Saint-Gobain's argument. In each of these cases the accused product, contrary to what is present here, was altered or changed in the effort to prove infringement.

In Orinco, the accused product was an orthodontic device. A claim construction that would "merely require that infringing devices be capable of being modified to conform to a specified claim limitation," 463 F.3d at 1307, was rejected. Here the SG16 was not modified to establish infringement of Claim 23. The snap-secure element is present in the SG16 at all times.

In Buszard, a claim was rejected by the Patent Office as anticipated by a particular reference. The finding of the Patent Office was reversed. The Federal Circuit said:

> Buszard's specification and claims specifically state the requirement of a flexible polyurethane foam reaction mixture. No matter how broadly "flexible foam reaction mixture" is construed, it is not a rigid foam reaction mixture. The Eling reference describes only a rigid foam reaction mixture that

18

> produces a rigid product.  Only by mechanically crushing the
> rigid product into small particles is it rendered flexible, as a
> rock can be mechanically crushed to produce particles of sand.
> This description cannot reasonably be construed to describe,
> and thus to "anticipate," the flexible foam product of a flexible
> foam reaction mixture.  We agree with Buszard that it is not a
> reasonable claim interpretation to equate "flexible" with "rigid,"
> or to equate a crushed rigid polyurethane foam with a flexible
> polyurethane foam.

504 F.3d at 1367.

Here again, the application of heat to demonstrate infringement was not out of order;

there is no temperature limitation called for by the claim language.

In <u>High Tech</u> the asserted claim in an infringement action was a endoscopic optical

device which included a rotatable camera which could rotate if two (2) sets of screws were

loosened.  In rejecting a finding of infringement by the district court, the Federal Circuit

said:

> In the AcuCam, as designed, sold, and intended for use, the
> camera is rigidly coupled to its housing.  The original and
> intended operating configuration of the device must be altered
> – by loosening the set screws – in order for the camera to
> rotate.
>
> The district court found a likelihood of infringement based on
> its conclusion that, but for the set screws, "the camera is
> otherwise coupled to the body member in such a manner that
> it is capable of being rotated."  But a device does not infringe
> simply because it is possible to alter it in a way that would
> satisfy all the limitations of a patent claim.

49 F.3d at 1555.

To repeat: the SG16 was not altered to prove infringement.

19

C.  Evidence of Infringement at Trial

Moving beyond the "heating" and "Mexico" arguments, Saint-Gobain takes issue with the jury's finding of infringement.  As noted, in assessing the sufficiency of the evidence to support the jury's finding of infringement, the Court does not weigh the evidence or assess its credibility.

Here internal Saint-Gobain documents, the display of the manufacturing process, and Miedema's testimony offer ample evidence to support the finding of infringement.

Miedema's testimony alone is sufficient.  Miedema examined the SG16, reviewed the manufacturing process, examined Saint-Gobain's internal documents, developed test procedures to determine if the glass was snap-secured in the frame, described the characteristics of the SG16, and found all the elements of Claim 23 in the SG16.  On this foundation, he expressed the opinion that the glass panel was snapped into place in the manner called for by Claim 23.

Saint-Gobain made much of the fact that one of the shelves Miedema tested broke when he attempted to insert and secure the glass panel.  His explanation, which the jury could have found credible, was that he was attempting to determine the temperature at which the frame would snap-secure the frame in place.  The fact that a shelf broke did not change his opinion.  Miedema was vigorously cross-examined.  The jury in finding infringement obviously did not give weight to the "broken shelf" argument.

In sum, the evidence was sufficient for the jury to find by a preponderance that Saint-Gobain assembled the SG16 by pressing the glass panel against and past the plastic frame relatively resilient end portion, thereby snap-securing, as that phrase is interpreted by the Court, the glass to the frame.

20

VII.  INVALIDITY

Saint-Gobain's argument that there was clear and convincing evidence at trial supporting a finding that Claim 23 was invalid has no merit.  The evidence at trial on the validity issue was essentially a reprise of the evidence put to the Court by the parties in its consideration of Saint-Gobain's motion for summary judgment on the issue of validity on the grounds of obviousness.  All this is described in the Memorandum And Order Denying Motion For Summary Judgment On Issue of Validity referenced above, and reported at 2007 WL 4534780 (W.D. Mich. Dec. 6, 2007).  Hamilton's opinion evidence on the issue, however, bears repeating.

Hamilton testified as to his experience in designing refrigerator in his career as an engineer.  He examined prior art refrigerator shelves as well as various types of snap fits, all of which he described in detail.  In the prior art, the refrigerator shelves encapsulated the glass panel.  The glass panel was inserted in a frame as part of the molding process.  A plastic was injected around the edge to secure the frame to the glass panel.  Hamilton also described various forms of snap fits.  Hamilton concluded that based on his experience in designing refrigerator shelves and the prior art references, it would not be obvious to one skilled in the art (there was no disagreement on who that was) to combine the references and come up with the refrigerator shelf described in Claim 23.

Stall, Saint-Gobain's expert, while expressing an obviousness opinion, did not explain how the snap present in the prior art could be adjusted or adapted to secure a glass panel in a plastic frame to yield the refrigerator shelf described in Claim 23.[4]

_____

[4]  Saint-Gobain's argument for obviousness reminds the Court of what Abraham Lincoln once said: Saying it doesn't make it so; even if you call a dog's tail a leg, it still

21

As the Court explained in denying summary judgment to Saint-Gobain, Memorandum, supra at 7:

> Saint-Gobain. . .makes clear that it is relying on the first rationale of the Patent Office Guidelines, namely that it is obvious to combine elements known in the prior art according to known methods to yield predictable results.  The facts [in evidence]. . .do not support a finding that there is a *reason to combine* the prior art reference to yield predictable results in the fashion called for by Claim 23.  While the prior art displays snap-securing, the references Saint-Gobain relies on are so far different than the snap-securing element of Claim 23 that it cannot be said that nothing more than a "known technique" to a new use is present.  Saint-Gobain has not identified a reason for a person of ordinary skill in the art to combine the elements in the prior art in the manner called for by Claim 23.
>
> The [expert] on which Saint-Gobain rely offer only conclusionary opinions.
>
> * * *
>
> Claim 23 calls for the edge portion of the plastic frame to move out of the way and then come back to snap the glass; the snap feature is integrated with the frame.  Nothing in the prior art suggests this.

In denying Saint-Gobain's motion for summary judgment, the Court said:

> What the denial [of the motion] says is that at this juncture of the case it is for a jury to decide.

The jury decided that it was not obvious to one skilled in the art to combine the prior art references to come up with Claim 23.  The '573 Patent was not proved invalid.

---

has only four legs.

## VIII.  CONCLUSION

While there are still open issues to be resolved, the basics of this case, validity and infringement, are now concluded.  The case really should have concluded with the finding that the SG1, SG2, and SG3 infringed the '573 Patent.  Why it started up again when the SG16 came to light has not really been explained.  There was never a good argument for invalidity even after KSR was decided.  See KSR v. Teleflex, 500 U.S. __, 127 S.Ct. 1727 (2007).  The issue has always been infringement.

As in many patent cases, a finding of infringement stems from how the claim-in-suit is construed.  Once Claim 23 was construed not to call for a particular temperature, the issue of infringement was never a serious one.  Unfortunately because Miedema was denied full access to Saint-Gobain's manufacturing process, it was inevitable that he would ultimately have to formulate his opinion by reverse engineering the Saint-Gobain shelf. This led to Saint-Gobain's specious argument that "cooking" established non-infringement. "Cooking" was a red herring.  Unfortunately, it took over two (2) years to take the color out of the herring.  Be that as it may, the Court can now say finé (almost) to this case.

SO ORDERED.


Dated:  April 21, 2008                    s/Avern Cohn
                                          AVERN COHN
                                          UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, April 21, 2008, by electronic and/or ordinary mail.

                                          s/Julie Owens
                                          Case Manager, (313) 234-5160

23