UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GEMTRON CORPORATION,

    Plaintiff,

-vs-

SAINT-GOBAIN CORPORATION,

    Defendant.
_____/

Case No. 1:04-0387
Hon: AVERN COHN

**MEMORANDUM AND ORDER DENYING MOTION FOR CONTEMPT**

**I. INTRODUCTION**

    This is a patent case. Defendant Saint Gobain Corporation (Saint-Gobain) has been found liable for infringing United States Patent Number 6,679,573 (the '573 patent) which is assigned to Plaintiff Gemtron Corporation (Gemtron) and directed generally to a refrigerator shelf. <u>Gemtron Corp v. Saint-Gobain Corp.</u>, 572 F.3d 1371 (Fed. Cir. 2009). Following the finding of liability, Saint-Gobain was permanently enjoined from making, using, or selling any of the infringing refrigerator shelves as well as any similarly constructed shelves. (Dkt. 829). The injunction took effect after the United States Court for the Federal Circuit affirmed this Court's ruling. (Dkt. 858). Saint-Gobain has designed around the '573 patent and began marketing and selling redesigned refrigerator shelves.

    Now before the Court is Gemtron's motion to hold Saint-Gobain in contempt for violating the permanent injunction. (Dkt. 860). Gemtron asserts that the redesigned refrigerator shelves fall within the scope of the permanent injunction because they are

only colorably different from the infringing shelves and also infringe the '573 patent. For the reasons that follow, Gemtron's motion is DENIED.

## II. FACTS

### A.

On January 20, 2004 the United States Patent and Trademark Office (PTO) issued United States Patent Number 6,679,573 to inventor Craig Bienick. Gemtron was the assignee of the patent. The patent described a refrigerator shelf in which a piece of glass is snap-secured into a molded plastic frame. Claim 23 of the '573 patent (claim 23), the claim at issue in the infringement case, states:

> A refrigerator shelf comprising a one-piece open frame made of substantially homogenous polymeric/copolymeric molded synthetic material and a piece of glass closing an opening defined by said frame; said open frame having opposite substantially parallel side frame portions and opposite substantially parallel front and rear frame portions; said glass piece having opposite substantially parallel side edges and opposite substantially parallel front and read edges; said side, front and rear frame portions being substantially contiguous to said respective side, front and rear edges; each of said side frame portions being defined by an upper wall, a side wall depending from each upper wall and a lower wall projecting from its side wall toward an opposite side wall with the opposing lower walls being spaced from each other and each defining with an associated upper wall a glass piece side edge-receiving channel, each upper wall and lower wall having a terminal free edge, said glass piece side edges being spaced a predetermined distance from each other, said upper wall terminal free edges being spaced a predetermined distance from each others, said lower wall terminal free edges being spaced a predetermined distance from each other, the predetermined distance of the glass piece side edges being appreciably greater than the predetermined distance of said upper wall edges and only slightly greater than the predetermined distance between said lower wall terminal free edges whereby said glass piece side edges are captively retained in said glass piece side-edge receiving channels, and

>   at least one lower wall of at least one of said front and rear frame portions **including a relatively resilient end edge portion which temporarily deflects and subsequently rebounds to snap-secure one of said glass piece front and rear edges** in the glass piece edge-receiving channel of said at least one front and rear frame portion.[1]

## B.

Saint-Gobain initiated this action in June 2004 when it sought declaratory judgment that three of its refrigerator shelves did not infringe the '573 patent. Saint-Gobain alleged that its shelves were manufactured by allowing the frame to shrink onto the glass panel as it cooled. Gemtron filed a counterclaim for infringement, alleging that Saint-Gobain's shelves were manufactured by snap-securing the glass panel into the plastic frame and infringed claim 23. The Court realigned the parties, making Gemtron the plaintiff and Saint-Gobain the defendant.

The parties disputed the meaning of the phrase "relatively resilient end edge portion which temporarily deflects and subsequently rebounds to snap secure." After a Markman Hearing, the Court construed the phrase to mean that "the end edge portion is sufficiently resilient that it can temporarily deflect and subsequently rebound when glass is being inserted into the frame." (Dkt. 113). Following this claim construction, the Court granted summary judgment on Gemtron's claim that three of Saint-Gobain's shelves infringed claim 23. (Dkt. 266). A jury subsequently found that a fourth St.

---

[1]At trial, the parties stipulated that the Saint-Gobain's shelf met every limitation of claim 23 except for the highlighted language above.

Gobain's shelf, SG16, infringed claim 23.[2]

After the jury verdict, the Court issued a final judgment which permanently enjoined Saint-Gobain from "making, using, selling, or offering for sale [the infringing refrigerator shelves] as well as any similarly constructed refrigerator shelves." (Dkt. 829). The Federal Circuit affirmed the permanent injunction.

After the finding of infringement, Saint-Gobain developed a number of new refrigerator shelves. These shelves include external locking bars that are inserted into the frame of the refrigerator shelves on either one or three sides. Both parties have provided the Court with samples of the redesigned shelves, enabling the Court to physically inspect the shelves and compare them to the infringing SG16 shelf.

Gemtron, in seeking to hold Saint-Gobain in contempt, asserts that the newly designed shelves are only colorably different from the SG16 shelf and infringe the '573 patent. Gemtron relies on the affidavit of Greg Miedema (Miedema), its expert at the infringement trial, who opines that the shelves incorporating external locking tabs on one side are constructed similarly to the SG16 shelf because they "have all the elements of claim 23."[3] Saint-Gobain relies on the affidavit of Paul Bonenberger (Bonenberger), an expert retained solely to address the redesigned shelves, who says that the newly designed shelves are more than colorably different from the SG16 shelf and do not infringe the '573 patent. He describes several differences between the

---

[2] The parties stipulated that a finding of infringement for the SG16 shelf would also apply to a series of other shelves manufactured by Saint-Gobain.

[3] Miedema's affidavit does not address the shelves with external locking tabs on three sides.

shelves, explains why these differences successfully design around the '573 patent, and questions Miedema's testing methods and conclusions. Significantly, Gemtron has not examined the manufacture of the new shelf. Evidence relating to manufacture played an important role in the infringement trial and was discussed by the Federal Circuit in its affirming of the finding of infringement.

## III. STANDARD OF REVIEW

Contempt "is a severe remedy, and should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." KSM Fastening Systems, Inc. v. H.A. Jones Co., 776 F.2d 1522, 1525 (Fed. Cir. 1985). While an enjoined party is entitled to design around the claims of a patent, it cannot employ modifications that are made for the purpose of "evad[ing] the court's order." Id. at 1526. Therefore a court must balance these competing interests and utilize its contempt power only when the differences between the newly designed and infringing products are merely colorable. Id. If the differences are more than colorable, the patentee must allege infringement in a new suit.

In order to find an enjoined party in contempt, a court must engage in a two-part inquiry. First, a court must determine "whether a contempt hearing is an appropriate forum in which to determine whether a redesigned device infringes, or whether the issue of infringement should be resolved in a separate infringement action." Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc., 154 F.3d 1345, 1349 (Fed. Cir. 1998). Contempt is only appropriate if the differences are merely colorable and requires "a comparison between the original infringing product and the redesigned device." Id. A difference is more than colorable if it creates a "substantial open issue with respect to

5

infringement." KSM, 776 F.2d at 1532. Therefore, the original infringing product and newly designed product must be compared in light of the patent claims. Additive Controls, 154 F.3d at 1350 (finding no substantial open issue of infringement when the differences did not relate to elements of the patent claim).

If a court concludes that a newly designed product is only colorably different from an infringing product, it must also determine "whether the new accused device infringes the claims of the patent. Id. at 1349.

In addition, a court must be mindful that contempt is a summary proceeding. KSM, 776 F.2d at 1531. "If substantial issues need to be litigated, particularly if expert and other testimony subject to cross-examination would be helpful or necessary, the court may properly require a supplemental or new complaint." Id.

## IV. ANALYSIS

### A.

Gemtron asserts that contempt is appropriate because Saint-Gobain's redesigned shelves are substantially similar to SG16, the infringing shelf. Gemtron asserts that the redesigned shelves meet each limitation of claim 23 and, therefore, cannot be more than colorably different from the infringing SG16 shelf. Gemtron describes the similarities between the SG16 shelf and the redesigned shelves as follows:

> Like the Original Infringing Shelves, the [redesigned] shelves are made of a substantially homogenous polymeric/copolymeric molded synthetic material. The [redesigned] shelves also include a contiguous frame and piece of glass closing an opening defined by the frame. An like the Original Infringing Shelves, the [redesigned] shelves have fingers on the underside of the frame that extend from

6

> the wall and form a channel with the upper walls. The
> fingers have relatively resilient end edge portions that
> temporarily deflect and subsequently rebound when the
> glass is being inserted into the frame.

Gemtron's argument focuses almost exclusively on the assertion that, like the SG16 shelf, the redesigned shelves contained a relatively resilient end edge permitting the glass panel to be snap-secured. In support of this assertion, Gemtron relies on the affidavit of Miedema as well as a video exhibit of Miedema snapping glass panels into two of Saint-Gobain's redesigned shelves.

Gemtron further asserts that, like the SG16 shelf, each side of the redesigned shelves has a lower wall which forms a channel to receive the glass panel. Gemtron focuses on small protrusions from the side walls which are present in both the SG16 shelf and redesigned shelves.

Gemtron also addresses the addition of the external locking bars by Saint-Gobain which are incorporated into the redesigned shelves. It asserts that these bars are irrelevant because claim 23 is a comprising claim which is infringed if all of the claim limitations are met, even if additional features are added. It also recognizes that the external locking bars may provide additional support for the glass panels, but argues that this is functionally the same as the adhesive that was added to the infringing shelves.

**B.**

Saint-Gobain asserts that its redesigned shelves are more than colorably different from the SG16 shelf because one or more of the lower walls have been replaced by external locking bars which are distinct from the frame and are added after

7

the glass is assembled.  Saint-Gobain also notes that there are two distinct versions of the redesigned shelves: a 1-sided lock shelf with external locking bars on one side and a 3-sided lock shelf with external locking bars on three sides.  Saint-Gobain relies on the following differences between the SG16 and the redesigned shelves:

| SG16 | 1-sided lock shelf | 3-sided lock shelf |
| --- | --- | --- |
| Shelf comprised of two parts: a plastic frame and glass panel | Shelf comprised of four parts: a plastic frame, a glass panel, <u>and two external locking bars</u> | Shelf comprised of five parts: a plastic frame, a glass panel, <u>and three external locking bars</u> |
| The plastic frame includes four lower walls which form glass-panel receiving channels | The plastic frame includes <u>three</u> lower walls which form glass-panel receiving channels | The plastic frame includes <u>one</u> lower wall which forms a glass-panel receiving channel |
| The side walls of the plastic frame are of a solid composition | One side wall of the plastic frame has slots to receive the external locking bars | Three side walls of the plastic frame have slots to receive the external locking bars |
| The plastic frame is uniform in structure of composition throughout | The plastic frame is not uniform in structure because the external locking bars are made of a different and stronger material | The plastic frame is not uniform in structure because the external locking bars are made of a different and stronger material |
| The glass piece is "snap-secured" in the plastic frame | The glass piece is not "snap-secured" in the plastic frame because the glass panel cannot sustain a load without the external locking bars | The glass piece is not "snap-secured" in the plastic frame because the glass panel cannot sustain a load without the external locking bars |

In addition, Saint-Gobain asserts that a different assembly process is used in the redesigned shelves.  At trial, it was established that the glass panel of the SG16 shelf was inserted into the frame by bending and twisting the frame around the panel.  In contrast, Saint-Gobain asserts that by replacing one or more lower walls with external locking bars

8

and maintaining the frames at a higher temperature during assembly, the glass panel is slid or dropped into the plastic frame without distorting the frame at all. After the glass panel is inserted, the external locking bars are added. The glass panel is secured by the external locking bars as the plastic frame cools and shrinks.

C.

The parties appear to dispute the relevance rather than the existence of the modifications identified by Saint-Gobain. A simple visual analysis of the redesigned shelves confirms that, on at least one side, the lower walls have been removed and replaced by external locking bars. On each redesigned shelf, the sides that lack lower walls still contain several smaller protrusions which surround three sides of the glass panels. However, a simple visual analysis cannot resolve whether or not the glass panels can be snap-secured in the redesigned frames in a manner that can secure a load. To be more than colorable, the modifications identified by Saint-Gobain must raise a substantial open issue of infringement. In other words, they must be related to the relevant claim of the patent-in-suit – claim 23 of the '573 patent. Thus the modifications identified by Saint-Gobain must be analyzed in the context of claim 23.

1.

Claim 23 describes a refrigerator shelf with "each of said side frame portions being defined by . . . a lower wall projecting from its side wall toward an opposite side wall . . . and each [lower wall] defining with an associated upper wall a glass piece side edge-receiving channel." All four sides of the SG16 frame have lower walls which extend across a significant portion of the side of the frame to form a glass piece side edge-receiving channel. In contrast, the redesigned frames lack such significant lower walls.

Gemtron's reliance on the similarities of the protrusions found on the corners of the SG16 and redesigned shelves is not sufficient to make the differences merely colorable. Although this similarity does exist, these protrusions only cover a few millimeters of the bottom of the glass panel. In contrast, the centrally located lower wall on the SG16 shelves covers several centimeters of the bottom of the glass panel and its absence in the redesigned shelves cannot be ignored. While the smaller protrusions may be sufficient to support a finding of infringement, the differences between the SG16 and redesigned shelves raise an substantial open issue of infringement and are more than colorable.

**2.**

In addition, claim 23 describes "a relatively resilient end edge portion which temporarily deflects and subsequently rebounds to snap-secure one of the glass piece . . . edges." The Court has construed this phrase to mean "the end edge portion is sufficiently resilient that it can temporarily deflect and subsequently rebound when glass is being inserted into the frame." Saint-Gobain does not dispute that the redesigned shelves can be snapped into the plastic frame. However, it asserts that, without the external locking bars, the redesigned shelves cannot support the weight of a full load in a functional refrigerator. Gemtron claims that this argument is irrelevant because the Markman Order did not incorporate a loading requirement into the claim language. However, the Court did state that "the language contained in Claim 1 of the '673 patent defines relative resilience in a manner which indicates an intention to preclude resilience to a degree which results in disassembly of the glass from the frame. (Dkt. 113, at 9). Therefore, a shelf which cannot support a load without disassembling may have an end edge piece which is too resilient and cannot snap-<u>secure</u>.

Neither party has provided any conclusive evidence as to whether the redesigned shelves can support an expected load without the external locking bars. Saint-Gobain relies on the testimony of Bonenberger, but did not conduct any tests of the redesigned shelves. However, Miedema's test is no more enlightening because he merely snaps the glass panel into the frame and does not apply a load to the assembled shelf. The redesigned shelves' ability to support a load is relevant; it has not been adequately addressed by either party. Given the parties' reliance on experts to address this issue, expert testimony, accompanied by testing, seems necessary to resolving this dispute. As the Federal Circuit noted "[i]f substantial issues need to be litigated, particularly if expert and other testimony subject to cross-examination would be helpful or necessary, the court may properly require a supplemental or new complaint." KSM, 776 F.2d at 1531.

**3.**

Based on the analysis above, a contempt proceeding is not the appropriate forum to resolve Gemtron's allegations of infringement.[4] When viewed in light of the limitations of claim 23, the differences between SG16 and the redesigned shelves appear more than colorable and raise substantial issues of infringement. Therefore Gemtron must pursue its claim of infringement in an plenary action against Saint-Gobain.

Because a contempt hearing is not a proper forum to address Gemtron's allegations, there is no need to address the second prong of the contempt analysis. Therefore the Court makes no findings as to whether the redesigned shelves infringe the '573 patent.

---

[4]While Saint-Gobain has identified several other differences between SG16 and the redesigned shelves, this decision is based solely on the differences discussed above.

Ordinarily the Court would schedule this matter for hearing. Upon review of the parties' papers, however, the Court finds that oral argument is not necessary. <u>See</u> E.D. Mich. LR 7.1(e)(2).

SO ORDERED.


Dated: February 5, 2010          s/ Avern Cohn
                                             AVERN COHN
                                             UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, February 5, 2010, by electronic and/or ordinary mail.

                                                   s/ Julie Owens
                                                   Case Manager, (313) 234-5160